## ANTON VEAASEN v. PILLSBURY FLOUR MILLS COMPANY.[1]

No. 34,322.

March 28, 1947.

*Lloyd P. Johnson* and *Bauers & Carlson*, for appellant.
*Maugridge S. Robb*, for respondent.

LORING, CHIEF JUSTICE.

This is an appeal from a judgment for defendant. Plaintiff brought an action to recover damages for personal injuries sustained April 29, 1940. There were two trials, each resulting in a verdict for plaintiff. After the second trial, defendant moved for judgment notwithstanding the verdict or a new trial. Judgment was granted, and plaintiff appealed.

Plaintiff suffered his injuries while working for the state as grain inspector in defendant's unloading yards, where he had been acting in that capacity for about three years prior to the accident. His duties were to inspect boxcars loaded with grain which were brought to the yards for unloading to determine whether there were any leaks by which grain escaped. He would note the number of the car, the

[1]Reported in 27 N. W. (2d) 413.

numbers on the car's seals, determine whether the seals had been tampered with, and if any damage or bad order sign had been placed on the car. The cars could not be unloaded until inspected and approved by an inspector.

This court is handicapped in its analysis of the facts, because the plat and some of the pictures introduced as exhibits were lost and are not before us. The record shows that there were six railroad tracks in these yards. They were parallel and ran in a general easterly and westerly direction. The accident here involved occurred at pit eight, between what was designated as track five and track six. These tracks were 11.3 feet apart. Grain cars were spotted at pits on tracks for inspection and unloading. At pit eight, cars were unloaded from either track by the aid of a power device mounted on a table between those tracks. The surface of this table was about level with the floor of a boxcar and was a little more than a foot wide. Its exact length is not shown, but the length of the table was parallel with the tracks. There was a space between the table and a car standing on track five of about two or three feet and between it and track six of four to five feet. The grain was shoveled out of the side door of the car, where it fell through an iron grating into the pit. This grating was similar to that used in city sidewalks, and it extended all the way between tracks five and six. Its lengthwise measurement is not shown. The purpose of the grating arrangement was to allow the grain to pass into the pit and still permit workmen to walk over the pit. Conveyor belts were operated in the bottoms of the pits to carry the grain into the tanks or bins. Sometimes grain would clog in the pit or, for other reasons, it would become necessary for a man to go into the pit. For this purpose, there was a removable section 2 feet 10 inches by 4 feet 6 inches in the grating between the table and track five. The length of the removable grating was parallel with track five. A ladder led down into the pit from the opening made by removing this grating.

On the particular day involved, plaintiff had arrived at work about 7 a. m. It was a dark morning, and visibility was unusually poor. He inspected cars on track six and on track four, so, according to his

description of his duties, he had passed over pit eight on the side near track six about 20 minutes previous to the time when he fell into it.

After inspecting these cars on track four and track six, he took his tickets, which contained the data of inspection, back to the shop. He then went to inspect the cars on track five. He was working easterly between track five and track six. A car on track six which he had previously inspected had been emptied into pit eight. Plaintiff states that the grain from the car on track six was extremely dusty. As he approached the pit, he noticed that a cloud of dust had formed as a result of the movement of the grain. He said, "Dust [is] so thick you can't see a yard on a day like that."

As he proceeded easterly, he was checking cars in the string on track five and concentrating on his duties. As he approached the pit, he noticed a man, the witness Wryk, in a kneeling or half-standing position, bent over, looking into the pit with his back toward plaintiff. This man was between the table and the boxcar on track five. Plaintiff states that as he came up to the man he put his hand on his shoulder, stepped a little to one side, and fell in front of him into the pit. He says that the man may have said something as he stepped into the pit but that he did not understand him. The man at the pit testified that he saw plaintiff and said, "Don't go just yet, the pit is open." He admitted on cross-examination that he said this just as plaintiff fell. He denied that plaintiff's hand was placed on his shoulder. Plaintiff admits that he did not look ahead and that he slid his feet across the grating as it was customary for him to do. Plaintiff had walked over pit eight perhaps a thousand times. He said that he had seen the section of the grate removed two or three times. He asserted that whenever the pit was open there were from two to six men around the opening and that they would call out that the pit was open. There was a light in the pit, but often this was covered with grain or grain dust, which would make it imperceptible. Plaintiff stated that he did not see that the pit was open. It is undisputed that plaintiff knew that there was no removable part of the grating between the table and track six. He could have gone around

the table on that side in perfect safety by merely passing the table on the side toward track six.

The lower court ordered judgment for defendant notwithstanding the verdict, because, in its judgment, plaintiff was guilty of contributory negligence as a matter of law.

The issue before this court is whether there is any evidence sufficient to create a question in the minds of reasonable men as to whether or not plaintiff was guilty of contributory negligence. If the evidence is conclusive that he was so guilty, the judgment must be affirmed.

Would a reasonably prudent man, in dust so dense, knowing that there was a removable grating on the side of the table next to track five, step into the space through which plaintiff fell without assuring himself that the grating was in place? Plaintiff was perfectly familiar with the situation and had been for three years. He saw that the man who was kneeling had his back to him and presumably would not be aware of his approach until he touched him or spoke to him. Notwithstanding his knowledge of the possible peril and the fact that he could see that the man was peering down into the pit, he did not speak to him nor did he touch him until just as he was stepping into the pit. There was an opportunity to pass the table on the other side in what he knew was perfect safety. We cannot escape the conclusion, as a matter of law, that a man of ordinary prudence would not have done as plaintiff did and that his conduct contributed proximately to his injury. Johnston v. Tourangeau, 193 Minn. 635, 259 N. W. 187; Huyink v. Hart Publications, Inc. 212 Minn. 87, 90, 2 N. W. (2d) 552, 553-554; Sartori v. Capitol City Lodge, 212 Minn. 538, 541, 4 N. W. (2d) 339, 341. His assumption that the grating was in place because there were not from two to six persons around it to warn him, as there had been on previous occasions, does not excuse him from ascertaining from the man actually there whether it was in place. Not to have done so, in the dense cloud of dust which shrouded the area over the spot where he knew the removable section was located, convicts him, in our minds, of want of ordinary care as a matter of law. Olson v. D. M. & I. R. Ry. Co. 213 Minn. 106,

5 N. W. (2d) 492. The man's position, peering down into the pit, should not have been without significance to him. In plaintiff's situation, he could not leave all the thinking to be done by others. Johnston v. Tourangeau, *supra*. No reasonably prudent man would.

Judgment affirmed.

UPON APPLICATION FOR REARGUMENT.

On April 25, 1947, the following opinion was filed:

PER CURIAM.

In view of the earnest contention of counsel in their petition for a rehearing, we have again read the entire record. From such reading, we are more convinced than ever that plaintiff's conduct was not that of a man of ordinary prudence under the circumstances and that his lack of reasonable care contributed proximately to his injury. It may be, as the witness Wryk said, that plaintiff was reaching for the car seal when he passed Wryk at the pit, although plaintiff himself said he was trying to read the car number.

Assuming, then, that plaintiff did not have the option of passing on the other side of the table to get to the car seal, he nevertheless was familiar, by his three years of observation and experience, with the practices of defendant's employes in unloading cars. As described by Wryk and not disputed by plaintiff, the men engaged in unloading cars worked in pairs, first shoveling the grain out of a car and through the grating into the pit. Then, if it was necessary to clean the pit before another car was unloaded into it, they would take up the removable section of the grating. One would go down into the pit while the other remained at the top by the control table to watch his crew mate and, of course, as appears from other evidence, to stop or otherwise control the conveyor, as well as to warn a passer-by of the open grate. Other pairs of men worked at other pits. Obviously, only one carload of grain could be unloaded at a time and the pit emptied if credit for the loads of grain was to be kept separate.

Assuming the truth of the rather incredible testimony of plaintiff that whenever he had seen the grate open defendant had maintained

two to six men to warn possible inspectors that the pit was open, nevertheless a warning from one man was as effective as if it came from several. Plaintiff had, of course, seen men on the pit when it was not open, but knowing, as he must have, the manner of conducting operations by the men who unloaded the cars, the presence of one man in the position that Wryk was in suggested the probability, at least, that his crew mate was in the pit and that the grate had had to be removed so that he could go down. Wryk so nearly filled the space between the table and the car that he formed a barrier across most of the passageway, and plaintiff had to sidle by him in the approximately ten inches of space between Wryk and the car. Plaintiff may have seen a man on the pit when the grate was not open, but he says that the dust was so dense on this occasion that he could not see a yard ahead of him. Notwithstanding the poor visibility, he did not speak to or look ahead of Wryk to see what Wryk was doing or to discover whether the pit was open. He crowded by Wryk and walked blindly into the opening without giving himself an opportunity either to look at the grating or to hear the warning that Wryk was trying to give him. Only the grossest lack of care for his personal safety can account for his conduct.

Petition denied.